FILED BY _____ D.C

UNITED STATES DISTRICT COURT   MAR -3   AM 2: 10
SOUTHERN DISTRICT OF FLORIDA
CLARENCE MADDOX
CLERK U.S. DIST. CT.
CASE NO. 02-20108-CIV-UNGARO-BENAGES/BROWN - MIAMI

VAN ECK EMERGING MARKETS
OPPORTUNITY FUND, L.P.,
a Delaware limited partnership,

       Plaintiff,

v.

REPUBLIC OF NICARAGUA,

       Defendant.

_____/

**GARNISHEE SWEDTEL AB'S MOTION TO DISMISS PLAINTIFF'S
SECOND AMENDED MOTION FOR ISSUANCE OF A WRIT OF
GARNISHMENT  AFTER JUDGMENT FOR
LACK OF PERSONAL JURISDICTION**

Garnishee Swedtel AB ("Swedtel AB"), by and through its undersigned

counsel, appears specially and for the limited purpose of moving this Court for entry

of an order dismissing Plaintiff Van Eck Emerging Markets Opportunity Fund,

L.P.'s ("Plaintiff") Second Amended Motion for Issuance of a Writ of Garnishment

After Judgment ("Second Amended Motion for Issuance of Writ of Garnishment")

for lack of personal jurisdiction, and in support states:

This is Plaintiff's third attempt to obtain a writ of garnishment against

Swedtel AB for the purpose of collecting a money judgment the Plaintiff obtained

against the government of Nicaragua.  As with the first two motions, the Second

Amended Motion for Issuance of Writ of Garnishment merely alleges the existence of a parent-subsidiary corporate relationship between Swedtel AB and its corporate subsidiary, Swedtel, Inc., but does not allege facts sufficient to support an alter-ego theory of personal jurisdiction.   Specifically, the second amended motion does not allege facts sufficient to demonstrate that Swedtel, Inc. was the alter-ego of Swedtel AB and that Swedtel AB created Swedtel, Inc. for a fraudulent or misleading purpose.   Therefore, Swedtel AB respectfully requests that this Court dismiss the Second Amended Motion for Issuance of Writ of Garnishment for lack of personal jurisdiction.   The grounds for this motion are set forth in greater detail in the following, incorporated memorandum of law.

## MEMORANDUM OF LAW

### OVERVIEW

As mentioned above, this is Plaintiff's third attempt to obtain a writ of garnishment against Swedtel AB for the purpose of collecting a money judgment the Plaintiff obtained against the Nicaraguan government.   Unable to collect that judgment, Plaintiff initiated these garnishment proceedings against Swedtel, Inc., a Florida corporation, and its parent corporation, Swedtel AB, a Swedish corporation. Although Swedtel, Inc. answered the writ against it, Swedtel AB, on the other hand, moved to dismiss the writ because Plaintiff had not alleged any facts to support this Court's exercise of personal jurisdiction over a non-resident foreign corporation. (D.E. 19.)   In addition, Swedtel AB moved to quash the attempted service of process on Swedtel AB because Plaintiff had served Swedtel, Inc.'s registered agent and not

Swedtel AB's.  Swedtel AB argued that service was improper because the initial motion for writ of garnishment had not alleged that Swedtel, Inc. was the alter ego of Swedtel AB so that service on the subsidiary would constitute service on the parent. (D.E. 19.)

Magistrate Judge Stephen Brown agreed with Swedtel AB and dismissed the initial writ, holding that the motion for writ of garnishment failed to allege any facts sufficient to invoke Florida's long-arm jurisdiction.  (See Order Granting Garnishee Swedtel AB's Motion to Dismiss Writ of Garnishment & Discovery Requests entered on May 22, 2002 (hereinafter "Order"), at 3; D.E. 33.)  But the Magistrate Judge allowed Plaintiff to file an amended motion for the issuance of a writ of garnishment. (D.E. 33 at 4.)

In June 2002, Plaintiff filed an amended motion for issuance of a writ of garnishment against Swedtel AB. (D.E. 34.) As with the initial motion, Swedtel AB moved to dismiss the amended motion because Plaintiff again had failed to allege facts sufficient to subject Swedtel AB to the jurisdiction of this Court.  (D.E. 39.) Again, Magistrate Judge Brown agreed with Swedtel AB and dismissed Plaintiff's amended motion because Plaintiff failed to establish that Swedtel AB formed or used Swedtel, Inc. for an improper purpose. (D.E. 50 at 2.) This Court affirmed the magistrate judge's order and dismissed with prejudice Plaintiff's amended motion for writ of garnishment. (D.E. 54.)

Upon reconsideration, this Court affirmed the previous rulings, again concluding that because the Plaintiff had failed to plead with specificity that

Swedtel AB engaged in any improper conduct in the formation of or use of Swedtel, Inc., the Court could not invoke personal jurisdiction over Swedtel AB. (D.E. 61 at 4.) But the Court indicated that Magistrate Judge Brown had erred in denying Plaintiff an opportunity to conduct jurisdictional discovery. (D.E. 61 at 6.) Therefore, the Court permitted the Plaintiff to file a Second Amended Motion for Issuance of Writ of Garnishment and to conduct limited discovery on jurisdiction. (D.E. 61 at 6-7.) Swedtel AB now moves to dismiss the Second Amended Motion for Issuance of Writ of Garnishment because, as before, the Plaintiff has not alleged facts sufficient to support an alter-ego theory of personal jurisdiction.

## ARGUMENT

### THIS COURT SHOULD DISMISS THE SECOND AMENDED MOTION FOR ISSUANCE OF WRIT OF GARNISHMENT BECAUSE IT FAILS TO SUFFICIENTLY ALLEGE ANY BASIS FOR INVOKING PERSONAL JURISDICTION OVER SWEDTEL AB[1]

This Court's determination of personal jurisdiction over Swedtel AB generally involves a two-part analysis: the Court must determine: (1) whether the plaintiff's allegations have satisfied the constraints of Florida's long-arm jurisdiction, section

---

[1] Although this Court ruled that Plaintiff may file a second amended motion, Swedtel AB still contends that, procedurally, Plaintiff first should have sought an order from this Court directing the Clerk of the Court to issue a new writ of garnishment against Swedtel AB and then properly serve Swedtel AB with that newly issued writ. And as Swedtel AB has consistently maintained throughout the course of these garnishment proceedings, Plaintiff never properly served Swedtel AB. Because the allegations in Plaintiff's motions for writ of garnishment fail to establish that Swedtel AB controlled Swedtel, Inc. to the extent that service of process on Swedtel, Inc.'s registered agent is effective on Swedtel AB, the only way to properly serve Swedtel AB is to personally serve Swedtel AB in Sweden under the terms of the Hague Convention. See Convention on Service Abroad of Judicial & Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361. Thus, to the extent necessary and to avoid waiving its arguments on improper service of process, Swedtel AB incorporates by reference herein the arguments raised in its motions to dismiss Plaintiff's initial and First Amended Motion for Issuance of Writ of Garnishment.

4

48.193, Florida Statutes, and (2) whether the exercise of jurisdiction comports with the due process requirements of the Fourteenth Amendment.  See Steinhilber v. Lamoree, 825 F. Supp. 1003, 1005 (S.D. Fla. 1992), aff'd, 15 F.3d 1097 (11th Cir. 1994); Venetian Salami Co. v. Parthenais, 554 So. 2d 499 (Fla. 1989).  The same rule applies to garnishment proceedings; to enforce a writ of garnishment against a non-resident garnishee, the plaintiff must have alleged, with specificity, a basis for long-arm jurisdiction.  See Sunrise Assisted Living, Inc. v. Ward, 719 So. 2d 1218, 1219 (Fla. 2d DCA 1998).  Where the plaintiff fails to allege specific facts to support the exercise of personal jurisdiction over a non-resident garnishee, the Court must dismiss the writ of garnishment.  See Cosmopolitan Health Spa, Inc. v. Health Indus., Inc., 362 So. 2d 367, 368-69 (Fla. 4th DCA 1978).

Instead of relying on Florida's long-arm statute to establish personal jurisdiction over Swedtel AB, however, Plaintiff relies on a limited exception to the two-step jurisdictional analysis where a subsidiary corporation is the alter-ego of the parent corporation.  While Florida courts have recognized an alter-ego exception to the long-arm jurisdictional analysis, see Qualley v. Int'l Air Serv. Co., 595 So. 2d 194, 196 (Fla. 3d DCA 1992), the plaintiff must, nevertheless, allege sufficient factual allegations demonstrating that the subsidiary corporation is the defendant's mere instrumentality or alter-ego and that the defendant acted improperly in forming or using the corporation.  See Bellairs v. Mohrmann, 716 So. 2d 320, 322-23 (Fla. 2d DCA 1998).  Plaintiff has failed to do so here.

5

## POINT I

### PLAINTIFF HAS NOT ALLEGED FACTS SUFFICIENT TO DEMONSTRATE THAT SWEDTEL, INC. IS THE "MERE INSTRUMENTALITY" OF SWEDTEL AB

Plaintiff attempts to invoke this Court's long-arm jurisdiction over Swedtel AB solely by demonstrating that Swedtel, Inc. is the alter ego of Swedtel AB. "A subsidiary is an 'alter ego' of its parent corporation if domination and control by the parent renders the subsidiary its mere instrumentality." Clark v. Matsushita Elec. Indus. Co., 811 F. Supp. 1061, 1067 (M.D. Pa. 1993). The "alter ego" theory of jurisdiction is "predicated on the idea that the parent corporation 'carries on a continuous and systematic part of its general  business within the forum state via its subsidiary.'" Cali v. East Coast Aviation Servs., Ltd., 178 F. Supp. 2d 276, 286 (E.D.N.Y. 2001). Accordingly, to prevail on an alter ego theory of personal jurisdiction, Plaintiff must demonstrate that the degree of control exercised by Swedtel "is greater than normally associated with common ownership and directorship." See In re:  Latex Gloves Products Liab. Litig., No. MDL 1148, 2001 WL 964105 at *3 (E.D. Pa. Aug. 22, 2001); see also Clark, 811 F. Supp. at 1067 ("The significant factor in this inquiry is the degree of control that the [parent corporation] retains over the [subsidiary]." (citations omitted)). "Absent a showing of such control, subsidiaries, even if wholly-owned, are presumed separate and distinct entities from their parent corporations." Clark, 811 F. Supp. at 1067.

In this case, there is no evidence that Swedtel AB controlled the business activities of Swedtel, Inc. to the degree necessary to establish that Swedtel, Inc. was the "mere instrumentality" or "alter-ego" of Swedtel AB.

## A.   There Is No Evidence That Swedtel AB Controlled Swedtel, Inc. Simply By Providing Administrative Services

The majority of Plaintiff's factual allegations relate solely to administrative services Swedtel AB provided to its subsidiary.  But those allegations do not demonstrate that Swedtel, Inc. was Swedtel AB's mere instrumentality for purpose of invoking personal jurisdiction.

A corporate parent may provide administrative services to its subsidiary in the ordinary course of business without calling into question the separateness of the two entities for purposes of personal jurisdiction.  See Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 945 (7th Cir. 2000), cert. denied, 532 U.S. 943, 121 S. Ct. 1046, 149 L.E.2d 348 (2001). The Seventh Circuit Court of Appeals in Central States noted that such services are normal and should not subject a parent corporation to liability:

> Parent corporations regularly provide certain services to their subsidiaries.  Such parents do not expect that performing these activities may subject them to liability because of the actions of the subsidiaries.

Id.

Here, Swedtel AB did nothing more than assist its subsidiary by providing financial support where necessary.  Plaintiff, however, attempts to establish

evidence of "control" by alleging that Swedtel AB was the *only* source of Swedtel, Inc.'s revenue. (Pl.'s Second Am. Mot. Issuance of Writ of Garnishment at 2, ¶ 6.) But Plaintiff is incorrect. In May 2001, Swedtel, Inc. contracted with New World Network USA, Inc. for telecommunication consultation services. In exchange for the consultation services, New World Network paid Swedtel, Inc. $50,000. (Affidavit of Diego Bravo at ¶ 4,[2] attached as Exhibit "A"; a copy of the contract is attached to the Affidavit.)

And although Swedtel AB may have financially assisted Swedtel, Inc., this is because Swedtel, Inc. was not able to independently establish sufficient contracts to collect revenues for itself. As Swedtel, Inc.'s Secretary, Xiomara Monteagudo, testified in her deposition and attested to in an affidavit, both of which are attached to this motion, Swedtel, Inc. began as a telephone consultation firm for the Caribbean and South American markets and later expanded into the Internet consultation services. (See Xiomara Monteagudo Dep. at 13, attached as Exhibit "B"; see also Affidavit of Xiomara Monteagudo, at 2, 6, attached as Exhibit "C".) Had Swedtel, Inc. obtained sufficient contracts with customers in the Caribbean and South America, as intended, it likely would not have had to rely on Swedtel AB for financial support.

As for the employees of Swedtel, Inc., Plaintiff alleges that only one person was an employee of Swedtel, Inc. and the rest were employed by Swedtel AB.

---

[2] The affidavit was filed in the similar case LNC Investments, Inc. v. The Republic of Nicaragua, No. 99-2090-CIV-SEITZ/BANDSTRA, in support of Swedtel AB's motion to dismiss LNC's amended motion for writ of garnishment.

Plaintiff's allegation, however, is not entirely accurate.  Tax records for Swedtel, Inc. for the year 2001 show that *Swedtel, Inc.* paid the wages and withheld taxes for the following five individuals:   Christer Bergman, Anders Robert Gure, Jan Karlsson, Per Stahl, and Xiomara Monteagudo. (See Monteagudo Aff. at 7 and attached Wage and Tax Records).  Their wages were paid by Swedtel, Inc. from Swedtel, Inc.'s bank account, and Swedtel, Inc. withheld their taxes.

At most, therefore, Swedtel AB merely provided administrative services to Swedtel, Inc.  As attested by Dag Norrby, Swedtel AB's Secretary, Swedtel, Inc. and Swedtel AB were separate corporate entities with separate offices, books, records, and bank accounts. (See Exhibit D, Affidavit of Dag Norrby, at ¶¶ 4,8,9.)  Nothing the Plaintiff has alleged in its Second Amended Motion for Issuance of Writ of Garnishment, therefore, establishes the requisite high degree of control by a parent over its subsidiary necessary to subject Swedtel AB to the jurisdiction of this Court.

## B.    There Is No Evidence That Swedtel AB Controlled Swedtel, Inc. Through Swedtel, Inc.'s Board Of Directors

Plaintiff's allegations concerning common directors are insufficient to establish personal jurisdiction against Swedtel AB under an alter-ego theory.  That a parent and subsidiary share common directors and officers may be a factor, that fact, alone, does not render a subsidiary corporation the "mere instrumentality" of the parent. See Clark, 811 F. Supp. at 1068.  Rather, "'[w]here a parent company constitutes one hundred percent of the stockholders of the subsidiary, it is to be expected that there will be directors which are common to the boards of both.'"  In

re:  Latex Gloves, 2001 WL 964105, at *4 (quoting Arch v. American Tobacco Co.,
984 F. Supp. 830, 838 (E.D. Pa. 1997)).  Accordingly, the Clark court held that
where the boards of directors for the parent and subsidiary corporations had only
one member in common, that fact fell far short of the type of evidence required to
establish the requisite control of the day-to-day operations of the subsidiary by the
parent corporation.  See 811 F. Supp. at 1068; see also Savin Corp. v. Heritage Copy
Prod., Inc., 661 F. Supp. 463, 469-70 (M.D. Pa. 1987) (holding that fact that four out
of twelve directors of the subsidiary were also directors and officers of the parent
corporation was insufficient to establish "control" by the parent over the subsidiary
corporation).

        Here, at all material times, each company had its own board of directors and
officers.  At the time Plaintiff initiated these garnishment proceedings, the board of
directors for Swedtel AB consisted of Jimmy Sundström, Anders Bark, Jan
Bruneheim, Sven Ekvall, Lars Jonnson, Anders Kronqvist, and Jan Larsson.  The
officers included Jimmy Sundström (President), Carina Bark (Vice President),
Anneli Danielsson (Chief Financial Officer), and Dag Norrby (Secretary).   In
contrast, the directors of Swedtel, Inc. were Carlos Mamby, Diego Bravo, and
Jimmy Sundström.  The only officers were Jan Karlsson (President) and Xiomara
Monteagudo (Secretary).  Thus, the only person that held a director position on both

10

boards of directors was Jimmy Sundström.  There were no other common directors and there were no common officers.[3]

Plaintiff points to the fact that several employees of Swedtel AB had served as directors of Swedtel, Inc.  That fact, however, is irrelevant.  Unless expressly designated as having such, an employee generally does not have the power to control the affairs of a corporation.  Plaintiff does not allege what, if any, managerial control such employees had over Swedtel AB.  Therefore, the fact that several employees of Swedtel AB may have served as directors of Swedtel, Inc. does not provide Swedtel AB with any greater ability to control Swedtel, Inc. and is not a factor in any analysis of whether Swedtel, Inc. is the alter ego of Swedtel AB.

## C.   There Is No Evidence That Swedtel AB Controlled Swedtel, Inc.'s Marketing And Operational Activities

Plaintiff's reliance on the fact that Swedtel AB's web page characterized Swedtel, Inc.'s Miami office as a regional office and on the fact that pencils and cups say "Swedtel" without distinguishing between Swedtel AB and Swedtel, Inc. is not sufficient to establish that Swedtel AB controlled Swedtel, Inc.   Common promotional or marketing images such as those contained on a web page are not sufficient to show that a parent controls the marketing or operational policies of the subsidiary.  See J.L.B. Equities, Inc. v. Ocwen Financial Corp., 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001).

---

[3] As Plaintiff correctly asserts in its Second Amended Motion for Issuance of Writ of Garnishment, Swedtel, Inc. ceased its business operations in January 2002.  Swedtel, Inc. was voluntarily dissolved in July 2002.

In J.L.B. Equities, as here, the plaintiff argued that a Florida corporation's web page, which treated the Florida corporation and its New York subsidiary as one, established that the Florida corporation exercised control over the New York subsidiary so as to invoke New York's long-arm jurisdiction statute over the Florida corporation.   The court, however, rejected the plaintiff's argument because a common web page does not equate to control:

> The Court is not persuaded that a failure to distinguish between parent and subsidiary on a web page is sufficient to show that the parent controls the subsidiary's marketing and operational policies. *An advertising strategy deciding not to present to its consumers the existence of a parent-subsidiary relationship is not equivalent to a showing that the parent corporation exercises any control over its subsidiary's operational or marketing activities.*

Id. (emphasis added).

Here, Plaintiff points to the fact that some cups and pencils with the name "Swedtel" inscribed in them do not distinguish between Swedtel AB and Swedtel, Inc.   It also relies on the fact that Swedtel AB's web page had indicated the existence of a Miami regional office.   But as the court in J.L.B. Equities held, a parent corporation's advertising decision to not draw a distinction between parent and subsidiary does not mean that the parent controls the subsidiary.   Plaintiff has not alleged any facts, other than general statements contained on the web page, that illustrate any actual exercise of control by Swedtel AB over Swedtel, Inc.'s marketing and operational activities.

## POINT II

**PLAINTIFF HAS FAILED TO ALLEGE ANY FACTS DEMONSTRATING THAT SWEDTEL AB ENGAGED IN IMPROPER CONDUCT IN THE FORMATION OR USE OF SWEDTEL, INC.**

### A.   Florida Law Requires Allegations Of Actual Wrongdoing To Establish Personal Jurisdiction Under An Alter-Ego Theory

As discussed above, a plaintiff wishing to invoke the alter ego exception must make sufficient factual allegations demonstrating that "the corporation is a mere instrumentality or alter ego of the defendant, **and** that the defendant engaged in improper conduct in the formation or use of the corporation." Bellairs v. Mohrmann, 716 So. 2d 320, 322-23 (Fla. 2d DCA 1998) (emphasis added); see also Woods v. Jorgensen, 522 So. 2d 935, 937 (Fla. 1st DCA 1988) (holding that the plaintiff must demonstrate the corporation is merely the shareholder's alter ego **and** is used for a fraudulent or misleading purpose to shield improper conduct) (citing Dania Jai-Alai Palace, Inc. v. Sykes, 450 So. 2d 1114 (Fla. 1984); LNC Investments, Inc. v. The Republic of Nicaragua, No. 99-2090-CIV-SEITZ/BANDSTRA, *2 (S.D. Fla. June 18, 2002) (order granting garnishee Swedtel AB's motion to dismiss writ of garnishment).

In Dania Jai-Alai, the Florida Supreme Court held that a party cannot pierce the corporate veil of a corporation without showing that the defendant engaged in improper conduct in the formation or use of the corporation. 450 So. 2d at 1121. In discussing the improper conduct requirement, the court relied on Riley v. Fatt, 47

So. 2d 769, 773 (Fla. 1950), which explained that "'the corporate veil will not be pierced, either at law or in equity, unless it be shown that the corporation was organized or used to mislead creditors or to perpetuate a fraud upon them. . . .'" Dania Jai-Alai, 450 So. 2d at 1119-20.  The court also relied on Advertects, Inc. v. Sawyer Indus., Inc., 84 So. 2d 21, 23-24 (Fla. 1955), which explained that the fact that one or two individuals own the stock of a corporation does not mean that the corporate entity is a fraud or the alter ego of its stockholders:

> The corporate veil will not be penetrated either at law or in equity unless it is shown that the corporation was organized or employed to mislead creditors or to work a fraud upon them.
> Every corporation is organized as a business organization to create a legal entity that can do business in its own right and on its own credit as distinguished from the credit and assets of its individual stockholders.  The mere fact that one or two individuals own and control the stock structure of a corporation does not lead inevitably to the conclusion that the corporate entity is a fraud or that it is necessarily the alter ego of its stockholders to the extent that the debts of the corporation should be imposed upon them personally.  If this were the rule, it would completely destroy the corporate entity as a method of doing business and it would ignore the historical justification for the corporate enterprise system.

Dania Jai-Alai, 450 So. 2d at 1120 (quoting Advertects, 84 So. 2d at 23-24); see also Roberts' Fish Farm v. Spencer, 153 So. 2d 718, 721 (Fla. 1963) ("Those who utilize the laws of this state in order to do business in the corporate form have every right to rely on the rules of law which protect them against personal liability unless it be shown that the corporation is formed or used for some illegal, fraudulent or other unjust purpose which justifies piercing of the corporate veil.").

Here, Plaintiff argues that Swedtel AB acted improperly simply because Swedtel, Inc. did not have separate assets. Plaintiff has not alleged any wrongdoing on the part of Swedtel AB or Swedtel, Inc. and has not alleged any facts suggesting that Swedtel AB formed or used Swedtel, Inc. to mislead creditors or to perpetuate a fraud on them. Nor can it. This case involves a garnishment proceeding initiated by Plaintiff to obtain assets belonging to the Nicaraguan government. Plaintiff has not sued Swedtel AB for wrongful conduct and there is no evidence to suggest that Swedtel AB engaged in improper conduct in relation to its subsidiary, Swedtel, Inc. Absent evidence of wrongdoing or improper conduct by Swedtel AB in the formation or use of Swedtel, Inc., therefore, Plaintiff cannot satisfy the second prong of the alter-ego theory of personal jurisdiction.

**B.      Absent Evidence Of Wrongdoing, The Formation Of A Shell Corporation, By Itself, Is Not Sufficient**

In an attempt to meet its burden, Plaintiff points to <u>Woods v. Jorgenson</u>, 522 So. 2d 935 (Fla. 1st DCA 1988), for the proposition that the formation of a shell corporation constitutes improper conduct. But its reliance on <u>Woods</u> is misplaced. In that case, the plaintiff sued a California trust, a Delaware corporation and a Florida corporation for breach of an employment contract. The California trust owned 75% of the Delaware corporation, which, in turn, owned 100% of the Florida corporation. The California trust moved to dismiss the complaint for lack of personal jurisdiction. The trial court denied the motion and the First District Court of Appeal affirmed. The district court concluded that because the Delaware and

15

Florida corporations were shell corporations without any separate assets or identity and totally controlled by the California trust as financial conduits for its business ventures, the California trust was amenable to suit in Florida under an alter-ego theory of jurisdiction. See id. at 937. In so holding, the district court applied the well-established rule that the corporate structure cannot shield a dominant shareholder from personal jurisdiction where the corporate entity is the shareholder's alter-ego, **and** it was used for a fraudulent or misleading purpose. See id. Thus, the district court did not hold, as Plaintiff suggests, that "improper conduct" occurs without any evidence of wrongdoing and simply because a subsidiary corporation is without separate assets or identity.

But even if it had, the court's holding would contradict well-established law requiring allegations and proof of improper conduct. See, e.g., McFadden Ford, Inc. v. Mancuso, 766 So. 2d 241, 243 (Fla. 4th DCA 2000) (holding that without an allegation and proof of wrongdoing, plaintiffs could not obtain personal jurisdiction over a non-resident defendant on the alter-ego theory); Hobbs v. Don Mealy Chevrolet, Inc., 642 So. 2d 1149, 1156 (Fla. 5th DCA 1994) (holding that without evidence that a non-resident subsidiary corporation was formed or used for an illegal, fraudulent or other unjust purpose, the mere fact that a Florida corporation and resident owned and controlled the subsidiary was insufficient to subject the subsidiary to jurisdiction in Florida); Barkett v. Hardy, 571 So. 2d 13, 14 (Fla. 2d DCA 1990) (holding that absent evidence of wrongdoing, fact that corporate formalities were not observed, that corporation was vehicle for personal interest of

shareholder, that corporation lacked equity capital and was a shell, and that corporate affairs were dominated by another person or entity were not sufficient to pierce the corporate veil); see also Dania Jai-Alai, 450 So. 2d at 1114; Advertects, 84 So. 2d at 23-24; Steinhardt v. Banks, 511 So. 2d 336, 339 (Fla. 4th DCA 1987) (holding that improper conduct is established where a corporation is a mere device or sham to accomplish some ulterior purpose, or to evade some statute, or to accomplish some fraud or illegal purpose, or where the corporation was employed by stockholders for fraudulent or misleading purposes).

Moreover, there is no evidence in this case that Swedtel, Inc. was organized as a shell corporation or as a financial conduit for Swedtel AB's business ventures. To the contrary, Swedtel, Inc. was organized as a separate business entity whose primary purpose was to provide Internet consultation services to the Caribbean and South America. That Swedtel, Inc. was unsuccessful in that endeavor and had to rely on Swedtel AB for its financial resources does not mean that Swedtel, Inc. was "created" as a shell corporation. Woods, therefore, does not apply to this case.

In sum, Swedtel AB cannot be subjected to the jurisdiction of this Court under an alter-ego theory of jurisdiction because the Plaintiff has not alleged facts sufficient to show that Swedtel, Inc. was the "mere instrumentality" of Swedtel AB and that Swedtel AB formed or used Swedtel, Inc. for an improper or fraudulent purpose. Accordingly, this Court must dismiss the Second Amended Motion for Issuance of Writ of Garnishment.

**POINT III**

**BECAUSE PLAINTIFF HAS NOT SATISFIED THE REQUIREMENTS FOR AN ALTER-EGO THEORY OF JURISDICTION, THERE IS NO BASIS FOR THIS COURT TO EXERCISE PERSONAL JURISDICTION OVER SWEDTEL AB**

Where the parent corporation does not dominate the subsidiary and the parent and subsidiary are separate and distinct entities, the actions of one corporation cannot be attributed to the other for purposes of asserting personal jurisdiction. See Central States, 230 F.3d at 944. Rather, each defendant's contacts with the forum state must be individually assessed to determine whether the exercise of personal jurisdiction is proper. See Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13, 104 S. Ct. 1473, 1482 n.13, 79 L. Ed. 2d 790 (1984). Thus, this Court must assess whether Swedtel AB's contacts with Florida satisfy the state and federal requirements for long-arm jurisdiction. In doing so, the Court must determine: (1) whether the plaintiff's allegations have satisfied the constraints of Florida's long-arm jurisdiction, section 48.193, Florida Statutes, and (2) whether the exercise of jurisdiction comports with the due process requirements of the Fourteenth Amendment. See Steinhilber v. Lamoree, 825 F. Supp. 1003, 1005 (S.D. Fla. 1992), aff'd, 15 F.3d 1097 (11th Cir. 1994); Venetian Salami Co. v. Parthenais, 554 So. 2d 499 (Fla. 1989).

Here, Plaintiff relies exclusively on the alter-ego theory of jurisdiction instead of the regular two-step jurisdictional analysis. As a result, it did not allege any facts that would bring Swedtel AB within the activities listed in section 48.193 of

Florida's long-arm statute.  And it did not allege any facts that would establish minimum contacts between Swedtel AB and Florida.  Nor can it.  As Dag Norrby's affidavit clearly illustrates, Swedtel AB has not engaged in any activity in Florida that would subject it to the long-arm jurisdiction of this Court.  See Exhibit D.

Therefore, Plaintiff's Second Amended Motion for Issuance of Writ of Garnishment is completely devoid of any allegations that would support personal jurisdiction under Florida's long-arm statute.  To the extent this Court holds that Plaintiff again failed to satisfy the elemental requirements for an alter-ego theory of jurisdiction, it must dismiss the Second Amended Motion for Issuance of Writ of Garnishment because Plaintiff has failed to demonstrate ***any basis*** upon which to subject Swedtel AB to the jurisdiction of this Court.  See McFadden Ford, Inc., 766 So. 2d at 243 (dismissing complaint against non-resident corporation where plaintiff failed to allege or prove that corporation had formed or used domestic subsidiary for improper purpose and plaintiff had not alleged any facts to bring non-resident corporation within any portion of Florida's long arm statute).

## CONCLUSION

The Second Amended Motion for Issuance of Writ of Garnishment should be dismissed because Plaintiff has failed to establish an alter-ego theory of personal jurisdiction.  Plaintiff has not alleged facts sufficient to demonstrate that Swedtel, Inc. was Swedtel AB's "mere instrumentality."  Plaintiff also failed to allege any facts to establish that Swedtel AB formed or used Swedtel, Inc. for an improper or fraudulent purpose.  Because Plaintiff has failed to satisfy its burden of

demonstrating a sufficient jurisdictional basis upon which to subject Swedtel AB to the jurisdiction of this Court, this Court should dismiss the Second Amended Motion for Issuance of Writ of Garnishment, with prejudice.

Respectfully submitted,

HOLLAND & KNIGHT LLP
Attorneys for Garnishee Swedtel AB
One East Broward Blvd., Suite 1300
Fort Lauderdale, Florida 33301
Tel.:  (954) 525-1000
Fax.: (954) 463-2030

By: _____
Brian K. Hole
Fla. Bar No. 0019968
Cathy A. Williams
Fla. Bar No. 0088862

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 3, 2003, a true and correct copy of the foregoing was furnished by U.S. Mail to:  Isaac Mitrani, Esq., Attorney for Plaintiff, Mitrani, Rynor, Adamsky & Macaulay, P.A., 2200 Suntrust International Center, One Southeast Third Avenue, Miami, Florida, and K. Chris Todd, Kellogg, Huber, Hansen, Todd, & Evans, P.L.L.C., 1615 M Street, N.W., Suite 400, Washington, D.C.

HOLLAND & KNIGHT LLP
Attorneys for Garnishee Swedtel AB
One East Broward Blvd., Suite 1300
Fort Lauderdale, Florida 33301
Tel.:  (954) 525-1000
Fax.: (954) 463-2030

By: _____
Cathy A. Williams
Fla. Bar No. 0088862

FTL1 #618471 v1

20

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 99-2090-CIV-SEITZ-GARBER

LNC INVESTMENTS, INC.,

        Plaintiff,

v.

REPUBLIC OF NICARAGUA,

        Defendant.
_____/

**AFFIDAVIT OF DIEGO BRAVO**

The undersigned authority, Diego Bravo, being duly sworn, deposes and states:

1.    This affidavit is made in support of the Motion to Dismiss the Amended Motion for Issuance of an Ex-Part Writ of Garnishment filed by Garnishee Swedtel AB in the above-styled action.

2.    I am a former director of Swedtel, Inc. Unless stated otherwise, I attest to the information contained in this affidavit based upon my personal knowledge.

3.    On January 31, 2002, Swedtel, Inc. closed its Miami office and ceased doing any business in Florida or any place else. Swedtel, Inc. closed its Miami office solely because it was not profitable and, as a result, was

not able to conduct its business operations.   Since January 2002, Swedtel, Inc. has been winding down its business affairs, and on June 20, 2002, Swedtel, Inc. filed its articles of dissolution with Secretary of State in Florida.

4.      Although Swedtel, Inc. received financial assistance from Swedtel AB, Swedtel AB was not Swedtel, Inc.'s only source of income.   In May 2001, Swedtel, Inc. executed a contract with New World Network USA, Inc., for telecommunications consultation services.   As a result of this contract, Swedtel, Inc. received $50,000 from New World Network USA, Inc.   (A copy of the contract between Swedtel, Inc. and New World Network USA, Inc. is attached to this Affidavit as Exhibit "A".)

FURTHER AFFIANT SAYETH NAUGHT.

By: _____
        Diego Bravo
        Former Director of Swedtel, Inc.

FTL1 #598485 v1

I, the undersigned, Björn Sandin, Notary Public of the City of Stockholm

hereby certify

DIEGO B R A V O,

duly authorized to sign  for

Swedtel Inc.,

has issued and signed the foregoing document,

Fee  300:-          Stockholm 2002-08-02
Crowns              Ex officio:

2

# TAB 1

## INDEPENDENT CONSULTANT AGREEMENT

THIS AGREEMENT, effective as of July 1, 2001, is entered into by and between New World Network USA, Inc., a Delaware corporation ("Company"), and Swedtel Inc., a Miami corporation ("Consultant").

WHEREAS, Consultant desires to perform, and Company desires to have Consultant perform, consulting services as an independent consultant to Company, and

NOW, THEREFORE, in consideration of the foregoing and of the material promises and conditions contained in this Agreement, the parties agree as follows:

1.      Services

Company engages the Consultant to provide services to the Company in the areas of facilitating and advising with respect to the possible development of telecommunications sales and services primarily relating to Curacao, and such other activities as the Company may direct during the term of this Agreement (collectively, the "Services"). Consultant shall report to and receive direction from the CEO David Warnes in connection with the performance of Consultant's obligations under this Agreement. It is anticipated that such Services will be provided to Company for an average of 50% of 40 hours per week during the Term of this Agreement (as defined in Section 5). Consultant's Services hereunder shall be performed by Consultant's employee, Jan Karlsson. If Jan Karlsson's relationship with Consultant is terminated for any reason, or if Jan Karlsson is not the party performing the Services hereunder on behalf of Consultant, then the Company may immediately terminate this Agreement.

2.      Independent Consultant.

(a)      Consultant shall at all times be an independent consultant with Company. Consultant is neither an employee nor an agent of Company for any purpose whatsoever. Consultant agrees that no statutory insurance, including, but not limited to, workers' compensation, unemployment insurance and disability insurance shall be carried on behalf of Consultant. The Consultant expressly acknowledges that no labor relationship exists between the Consultant and the Company. Accordingly, the Consultant hereby agrees to indemnify Company and it affiliates for any claim that is brought against it by Consultant in connection with the rendering of the services which are the subject matter of this agreement. Without limiting the foregoing, Consultant shall not be entitled to receive any vacation or illness payments, or to participate in any plans, arrangements or distributions by Company pertaining to any bonus, stock options profit sharing, insurance or similar benefits for Company's employees. Consultant shall not enter into any agreement or obligation on behalf of Company without prior written approval from Company. Absent prior written Company approval, Consultant shall not have any authority to act for or to bind Company in any way, to sign the name of Company or to represent that Company is in any way responsible for the acts or

omissions of Consultant.

(b)     Consultant may perform services under this Agreement on Consultant's premises or such other locations agreed upon by Company and Consultant's services shall be performed at the mutual convenience of Company and Consultant; provided, however, that Consultant shall be reasonably available to assist Company during regular business hours.

(c)     Consultant agrees that no income, social security or other taxes or amounts shall be withheld or accrued by Company for Consultants benefit. Consultant will indemnify Company and hold it harmless from and against all claims, damages, losses and expenses, including reasonable fees and expenses of attorneys and other professionals, relating to any obligation imposed on Company to pay any taxes including, without limitation, withholding taxes, social security, unemployment or disability insurance, or similar items in connection with compensation received by Consultant pursuant to this Agreement. If Company is audited by any authority and if the Company's non-withholding of taxes, as contemplated by this paragraph, becomes an issue in such audit, Consultant will provide Company with copies of Consultant's personal and/or corporate income tax returns for the period under audit.

(d)     Consultant agrees that Company shall not carry any liability insurance regarding personal or property damage for the benefit of Consultant and that Consultant will be responsible for maintaining any insurance coverage that may be required of Consultant by law.

3.     Consulting Fee.

(a)     During the Term, Consultant will receive a fee of $10,000.00 per month paid $5,000.00 semi-monthly. Consultant is to submit an invoice to Consultant's manager with the Company for approval, accompanied by detailed time records and activities completed during said period stating total amount due for period.

(b)     The payments under this section shall constitute Consultant's sole compensation for the performance of Consultant's services under this Agreement.

4.     Expenses.

(a)     Reasonable, pre-approved travel and accommodation expenses will be paid by the Company, in accordance with Company policy.

(b)     Consultant will be reimbursed for all pre-approved reasonable out of pocket expenses directly related to New World Network business in the manner provided by Company policy.

(c)     Consultant shall submit written documentation and receipts where available itemizing the dates on which expenses were incurred. The Company shall pay Consultant the amounts due pursuant to submitted reports within seven (7) days after approval of the report by the Company, such approval not to be unreasonably withheld or delayed.

111/120574.01.00
071498/1653/39186.00100 - ICA96.PS0



5.    Term and Termination

      The Term of this Agreement shall begin on the date first written above and shall be for a period expiring on December 31, 2001.  The parties may elect to extend this Agreement for successive one month periods, by mutual written agreement.  Notwithstanding the foregoing, upon not less than 30 days toice (other than for cause in which case no notice shall be required), either party may terminate this Agreement.

6.    Proprietary Rights and Confidentiality.

      As a condition of performing services under this Agreement, Consultant shall execute the "Proprietary Rights and Confidentiality Agreement," attached hereto as Exhibit A and made a part hereof by this reference. This provision shall survive the termination or expiration of this Agreement.

7.    Indemnification

      Consultant will indemnify Company and hold it harmless from and against all claims, damages, losses and expenses, including court costs and fees and expenses of attorneys, expert witnesses, and other professionals, arising out of or resulting from, and, at Company's option, Consultant will defend Company against any action by a third party that is based on, any negligent act or omission or willful conduct of Consultant or Consultant's violation of any statute, ordinance or regulation.  This provision shall survive the termination or expiration of this Agreement.

8.    Arbitration and Attorneys' Fees.

      With the exception of matters arising under section 5 of this Agreement, any controversy between Company and Consultant, and those involving the construction or application of any of the terms, provisions or conditions of this Agreement or otherwise arising out of or relating to this Agreement, shall be settled by arbitration in accordance with the then current commercial dispute resolution rules of the American Arbitration Association, and judgment on the award rendered by the arbitrator(s) may be rendered by any court of competent jurisdiction.  Unless determined otherwise by the arbitrator, the Company and Consultant shall share the costs of the arbitrator equally but shall each bear their own costs and legal fees associated with the arbitration; provided, however, that all of the Company's fees, costs and expenses for which the Company is indemnified under section 2(a) shall be promptly reimbursed to Company by Consultant or may be deducted by Company from any consideration due to Consultant.  The location of the arbitration shall be in Miami, Florida.

      In the event of a breach of any of the covenants contained in section 5 of this Agreement, it is recognized that Company and Consultant shall each be entitled to institute or prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages for any breach of this Agreement or to sue for specific performance, or injunction against performance of any acts or to seek any other available remedy.

9.      Modification

Any modification of this Agreement will be effective only if it is in writing and signed by the parties to be bound thereby.

10.      Entire Agreement

This Agreement constitutes the entire agreement between Company and Consultant, pertaining to the subject matter hereof, and supersedes all prior or contemporaneous written or verbal agreements and understandings with Consultant in connection with the subject matter hereof.

11.      Governing Law

This Agreement and the rights and obligations hereunder shall be governed by the laws of Florida as to contracts wholly performed within the state, and the parties to this Agreement specifically (a) consent to the jurisdiction of the courts of Florida over any action arising out of or related to this Agreement and (b) expressly waive to any other jurisdiction which may correspond to them by reason of their present or future domiciles.

12.      Severability

If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall, nevertheless, continue in full force and effect without being impaired or invalidated in any way.

13.      Waiver

The parties hereto shall not be deemed to have waived any of their respective rights under this Agreement unless the waiver is in writing and signed by such waiving party.  No delay in exercising any right shall be a waiver nor shall a waiver on one occasion operate as a waiver of such right on a future occasion.

14.      Notices

All notices provided for herein shall be in writing and shall be deemed to have been given when delivered personally, or when delivered by reputable national, overnight courier, postage prepaid, addressed as follows:

To Company:      New World Network USA, Inc.
                 ATTN: General Counsel
                 2977 McFarlane Road, #300
                 Miami, Florida 33133

*Tel: 305 529 9700*
*Fax: 442 9051*

To Consultant:  Swedtel Inc.
                10640 NW 27th St

Suite 201
Miami, Florida 33172

or at such other addresses as either of said parties may from time to time in writing appoint.

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers or agents.

NEW WORLD NETWORK USA, Inc.

Dated: 17/5/01

By _____
David Warnes
Chief Executive Officer

CONSULTANT

SWEDETEL, INC.

Dated: 17/5 - 01

By _____
Jan Karlsson
President

111/120574.01.00
071498/1653/39186.00100 - ICA96.P50



PROPRIETARY RIGHTS AND CONFIDENTIALITY AGREEMENT

EXHIBIT A  TO INDEPENDENT CONSULTANT AGREEMENT between NEW WORLD
ONETWORK USA, Inc. ("Company") and Telia Swedetel, Inc. ("Consultant")

In return for new or continued contract services to Company, Consultant
acknowledges and agrees, on behalf of itself and its employees, as follows:

1.      For the purposes of this Agreement:

(a)      "Information" shall mean any and all discoveries, ideas, facts, or
any other information relating to the operation of the Company's business, of whatever type and
in whatever form, which is disclosed or otherwise made available to Consultant by Company in
confidence, including, but not limited to, all information relating to personnel, sales, customers
and financial and scientific matters of Company, and any other discoveries, ideas, business
plans, or facts relating to any of the foregoing, whether developed by Consultant or by others;

(b)      "Trade Secret" shall mean any and all Information that derives
independent economic value, actual or potential, from not being generally known to persons who
can obtain economic value from its disclosure or use, and that is the subject of reasonable efforts
by Company to maintain its secrecy.

(c)      "Inventions" shall mean designs, trademarks, discoveries,
formulae, processes, manufacturing techniques, Trade Secrets, Information, improvements,
ideas, inventions or copyrightable works.

(d)      Information, Trade Secrets and Inventions shall include the
Information, Trade Secrets and Inventions of Company, its parents, affiliates, successors,
assigns, agents, subcontractors, officers, directors and the like.

2.      Consultant understands that any and all Information and Trade Secrets are
received or developed by him/her/it and are disclosed to him/her/it in confidence, and are to be
used only for the purposes for which they are provided.  During the term of his/her/its contract
with Company or thereafter, Consultant shall not, directly or indirectly, except as required by the
normal business of Company or expressly consented to in writing by the Board of Directors of
Company:

(a)      disclose, publish or make available any Information or Trade
Secrets, other than to an employee, officer or director of Company who, in the reasonable
exercise of Contractor's judgment, needs to know such Information or Trade Secrets in order to
perform his or her duties to Company;

(b)      sell, transfer or otherwise use or exploit or permit the sale, transfer,
use or exploitation of the Information or Trade Secrets for any purposes other than those for
which they were provided;

Case 1:02-cv-20108-UU   Document 64   Entered on FLSD Docket 03/04/2003   Page 31 of 55

      (c)    remove from Company's premises or retain upon termination of Consultant's Agreement any Information or Trade Secrets, any copies thereof or any tangible or retrievable materials containing or constituting Information or Trade Secrets.

      3.    Upon termination of Consultant's agreement or upon request by Company, Consultant shall return to Company all tangible forms of Information and Trade Secrets.

      4.    Consultant agrees to disclose promptly to the Company any and all Inventions, whether or not patentable and whether or not reduced to practice, conceived or learned by Consultant during the period that Consultant is providing services to Company, either alone or jointly with others, which relate to or result from the actual or anticipated business, work, research or investigations of the Company, or which result, to any extent, from use of the Company's premises or property. Consultant understands that Company is the sole owner of any and all property rights in Inventions, including, but not limited to, the right to use, sell, license or otherwise transfer or exploit the Inventions, and the right to make such changes in them and the uses thereof as Company may from time to time determine. Consultant agrees to disclose and assign to Company, without further consideration, his/her/its entire right, title, and interest (throughout the United States and in all foreign countries) free and clear of all liens and encumbrances, in and to all Inventions, which shall be the sole property of Company, whether or not patentable. Consultant also agrees to cooperate with Company both during and after the contract period in obtaining and enforcing patents, copyrights, and other protection of Company's rights in Inventions.

      5.    Consultant certifies that there is no other contract or duty on Consultant's part that would interfere with Consultant's ability to provide services to Company. Consultant agrees that, in performing work for Company, Consultant will not knowingly use any patented inventions, trade secrets, confidential information or proprietary information obtained from third parties, including any prior employer or any other organization or individual. Consultant agrees not to use copyrighted materials, nor any portion thereof, of any other company or person while writing computer programs, manuals or any other materials for Company, and that Consultant will not bring onto the premises of Company any unpublished document or other property containing proprietary information or trade secrets belonging to Consultant's former or concurrent employers or companies, unless consented to in writing by said employers or companies.

      6.    This Agreement does not constitute a contract of employment and does not in any way restrict Consultant's right or the right of Company to terminate Consultant's contract with Company.

      7.    The provisions of this Agreement shall survive the termination or expiration of the Independent Consultant Agreement to which this Agreement is attached.

Swedtel, Inc,

Dated: 1/5 -01

111/120574.01.00
071498/1653/39186.00100 - ICA96.P50

# EXHIBIT B

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF FLORIDA

SUBPOENA IN A CIVIL CASE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT
OF NEW YORK
CASE NUMBER: 00 Civ. 5756 (WHP)

VAN ECK EMERGING MARKETS
OPPORTUNITY FUND, L.P.,

vs.

REPUBLIC OF NICARAGUA.
_____/

COPY

One Southeast Third Avenue
Miami, Florida
February 12, 2002
9:00 a.m. - 10:50 a.m.

DEPOSITION OF XIOMARA S. MONTEAGUDO

Taken before Dona Caccavale-Fisher, Registered

Professional Reporter and Notary Public for the State

of Florida at Large, pursuant to Subpoena.

KLEIN, BURY & ASSOCIATES

Exhibit A

13

```
 1    sure.
 2         Q    Okay.  Well tell us what Swedtel, Inc. did?
 3    What was its business?
 4         A    Started as telephone consultancy, and then it
 5    expanded to Internet consultancy for the Caribbean and
 6    South America.
 7         Q    And you began in 1997 working with Swedtel,
 8    Inc., correct?
 9         A    Yes.
10         Q    How long -- what's your understanding of how
11    long Swedtel, Inc. had been in existence here in Miami
12    prior to that?
13         A    I believe it was 1995, the latter end of
14    1995.
15         Q    And what do you base that on, that statement?
16         A    Based on the Articles of Incorporation when
17    they were first filed.
18         Q    Do you know who incorporated it?
19         A    The attorney Rex Guthrie, G-U-T-H-R-I-E.
20         Q    Is Mr. Guthrie here in Miami, Florida?
21         A    Yes, he is.
22         Q    And you know what firm he is with?
23         A    He's a sole practitioner.
24         Q    And who are the owners of Swedtel, Inc. when
25    it was initially incorporated?
```

KLEIN, BURY & ASSOCIATES

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 02-20108-CIV-UNGARO-BENAGES

MAGISTRATE JUDGE BROWN

VAN ECK EMERGING MARKETS OPPORTUNITY
FUND, L.P., a Delaware limited partnership,

       Plaintiff,

v.

REPUBLIC OF NICARAGUA,

       Defendant.

                              /

## AFFIDAVIT OF XIOMARA MONTEAGUDO

The undersigned authority, Xiomara Monteagudo, being duly sworn, deposes and states:

1. This affidavit is made in support of the Motion to Dismiss the Writ of Garnishment and Reply filed by Garnishee Swedtel AB in the above-styled action.

2. I am the Registered Agent of Swedtel, Inc. Unless stated otherwise, I attest to the information contained in this affidavit based upon my personal knowledge.

3. Swedtel, Inc. is a Florida corporation, with its last principal place of business formerly located at 10640 NW 27th Street, Suite C-201, Miami, Florida. Swedtel, Inc. started out as providing telephonic consultants and eventually expanded into the Internet consultation services.

4. On January 31, 2002, Swedtel, Inc. closed its office in Miami. It has no other offices in the United States. Therefore, as of January 31, 2002, Swedtel, Inc. is no longer operating in the United States in any manner whatsoever.

5. While Swedtel, Inc. was in operation, however, I was the Office Manager. Therefore, I maintained and continue to maintain Swedtel, Inc.'s business books and records, which are located in Miami, Florida.

6. Upon information and belief, Swedtel, Inc. did not conduct or attempt to solicit any business in the State of Florida. All of Swedtel, Inc.'s business activities and operations were directed to potential customers in South America and the Caribbean.

7. Further, during the year 2001, Swedtel, Inc. paid the wages and withheld taxes for the following five individuals: Christer Bergman, Anders Robert Gure, Jan Karlsson, Per Stahl, and myself. (See Swedtel, Inc.'s Wage and Tax Records, attached as Tab 1.)

FURTHER AFFIANT SAYETH NAUGHT.

By: _____

     Xiomara Monteagudo
     Registered Agent
     Swedtel, Inc.

STATE OF FLORIDA       )
COUNTY OF BROWARD    ) ss.

Sworn to (or affirmed) and subscribed before me this _18th_ day of April, 2002 by _Xiomara Monteagudo_, who is personally known to me or has produced _____ as Identification.

(SEAL)

    Guido Ramos
_____
Notary Public-State of Florida

GUIDO RAMOS
Notary Public - State of Florida
My Commission Expires Oct 10, 2003
Commission # CC878462

Commission Number: _____
My Commission Expires: _____

FTL1 #585581 v2

2

*TAB 1*

Case 1:02-cv-20168-JU   Document 82   Entered on FLSD Docket 03/04/2002   Page 40 of 55

TELIA SWEDTEL INC

Wage and Tax Register

COMPANY TOTAL



**SPECIAL INDICATORS:**

- = SOCIAL SECURITY NUMBER IS INVALID OR MISSING
- = CREDIT EMPLOYEE: EXCLUDED FROM QUARTER WAGE REPORTS
- = CREDIT EMPLOYEE: EXCLUDED FROM 941 AND 940
- = CITY/STATE OR ZIP CODE IS MISSING/INVALID AND STATE CODE IS NOT EQUAL 69 IF/ONE/ONE IF FOREIGN EMPLOYEE STATE TAX CODE = 69), CITY AND STATE TAXI ARE MISSING
- = CREDIT EMPLOYEE: EXCLUDED FROM STATE AND CITY TAX RECONCILIATION WORKSHEETS
- = CREDIT EMPLOYEE: EXCLUDED FROM ALL ANNUAL REPORTS (i.e. W2, 1099R, etc.)
- = CREDIT EMPLOYEE: EXCLUDED FROM W2 FEDERAL, STATE, AND LOCAL.

P = PARTIAL CREDIT EMPLOYEE: 1 OR MORE FILE NUMBERS IN A CROSS SET ARE A 'Y' ITEAM END CREDITS FOLLOWS

* = PARTIAL CREDIT EMPLOYEE: SAME RULES AS 'P'

**DISQUALIFICATION REPORT SPECIAL INDICATORS: Per New Credit Employee**

- M = EMPLOYEE HAS NO W-2 MONIES, NO PENSION INDICATOR BUT DOES HAVE DEPENDENT CARE BENEFIT BOX
- L = EMPLOYEE WITH CITY TAX, BUT HAS NO CITY TAX CODE OR HAS A CITY TAX CODE OF 869.
- C = EMPLOYEE THAT HAS WBF TAX, AND IS NOT SETUP WITH A SUI CODE OF '93'
-     EMPLOYEE THAT HAS WBF TAX, AND IS SETUP WITH A SUI CODE OF '93', AND DOES NOT HAVE WBF HOUR
- N = EMPLOYEE HAS AN "INDIVIDUAL TAX PAYER IDENTIFICATION NUMBER" IN PLACE OF THEIR SOCIAL SECURITY NUMBER, AND WILL BE EXCLUDED FROM W2 FEDERAL, STATE, AND LOCAL.

DELTA SHUTTLE INC.

**** Wage and Tax Register ****
**** COMPANY TOTAL ****

ADP
Automatic Data Processing
MIAMI REGION

01/12/0117

* SOCIAL SECURITY NUMBER IS INVALID OR MISSING

* CREDIT EMPLOYEE: EXCLUDED FROM QUARTER WAGE REPORTS

* CREDIT EMPLOYEE: EXCLUDED FROM 941 AND 940

* CITY/STATE OR ZIP CODE IS MISSING/INVALID AND STATE CODE IS NOT EQUAL 89 FOREIGN
  IF FOREIGN EMPLOYEE STATE TAX CODE = 89, CITY AND STATE TAX ARE MISSING

* CREDIT EMPLOYEE: EXCLUDED FROM STATE AND CITY TAX RECONCILIATION WORKSHEETS

* CREDIT EMPLOYEE: EXCLUDED FROM ALL ANNUAL REPORTS (i.e. W2, 1099R, etc.)

* PARTIAL EMPLOYEE; EXCLUDED FROM STATE AND CITY TAX

DISQUALIFICATION REPORT SPECIAL INDICATORS: (For Non Credit Employees)

M - EMPLOYEE HAS NO W-2 MONIES, NO PENSION INDICATOR, BUT DOES HAVE DEPENDENT CARE BENEFIT $$$.

L - EMPLOYEE WITH CITY TAX, BUT HAS NO CITY TAX CODE OR HAS A CITY TAX CODE OF 089.

C - EMPLOYEE THAT HAS WH/ TAX, AND IS NOT SETUP WITH A SUI CODE OF '43'
                                    - OR -
    EMPLOYEE THAT HAS WH/ TAX, AND IS SETUP WITH A SUI CODE OF '43'; AND DOES NOT HAVE WH/ HOURS.

W - EMPLOYEE HAS AN "INDIVIDUAL TAX PAYER IDENTIFICATION NUMBER IN PLACE OF THEIR SOCIAL SECURITY
    NUMBER, AND WILL BE EXCLUDED FROM W/ FEDERAL, STATE, AND LOCAL.

Wage and Tax Register
** JURISDICTION RECAP **

ADP

Case 0:01-cv-20168-UU   Document 84   Entered on FLSD Docket 03/04/2003   Page 45 of 55

Wage and Tax Register
... DETAIL PAGE ...

3rd Quarter

BERGMAN CHRISTER
KARLSSON, ...
MONTEAGUDO, ...
STAHL, ...

Case 1:02-cv-20198-JIC Document 63 Entered on FLSD Docket 3/04/2003 Page 46 of 55

The document is too faded and degraded to reliably transcribe the tabular content. The visible elements include a header area referencing "TELIA SWEDTEL INC", "Wage and Tax Register", "COMPANY TOTAL", and "ADP" / "Employer Tax Processing" / "PLANT REGION".

Partial legible values in the table area include: 835400, 823400 / 824000 / 180707, 897431 / 39181, 825400 / 12113, 825400, 2090, 11400.

SPECIAL INDICATORS:

* = SOCIAL SECURITY NUMBER IS INVALID OR MISSING

C = CREDIT EMPLOYEE, EXCLUDED FROM QUARTER WAGE REPORTS

C = CREDIT EMPLOYEE, EXCLUDED FROM 941 AND 943

IF FOREIGN EMPLOYEE STATE TAX CODE = 99; CITY AND STATE (#%) ARE MISSING

CREDIT EMPLOYEE: EXCLUDED FROM STATE AND CITY TAX RECONCILIATION WORKSHEETS

CREDIT EMPLOYEE: EXCLUDED FROM ALL ANNUAL REPORTS (i.e. W2, 1099R, etc.)

PARTIAL CREDIT EMPLOYEE; 1 OR MORE FILE NUMBERS IN A C5SSN SET ARE A 'Y' YEAR END CREDIT. FOLLOWS SAME RULES AS 'Y'.

DISQUALIFICATION REPORT SPECIAL INDICATORS (For Non-Credit Employees)

W = EMPLOYEE HAS NO W-2 NUMBER, NO PENSION INDICATOR, BUT DOES HAVE DEPENDENT CARE BENEFIT $$$

L = EMPLOYEE WITH CITY TAX, BUT HAS NO CITY TAX CODE OR HAS A CITY TAX CODE OF 0999.

C = EMPLOYEE THAT HAS WBF TAX, AND IS NOT SETUP WITH A SUI CODE OF '95'.

EMPLOYEE THAT HAS WBF TAX, AND IS SETUP WITH A SUI CODE OF '95', AND DOES NOT WBF HOLD

N = EMPLOYEE HAS AN "INDIVIDUAL TAX PAYER IDENTIFICATION NUMBER" IN PLACE OF THEIR SOCIAL SECURITY NUMBER, AND WILL BE EXCLUDED FROM W2 FEDERAL, STATE, AND LOCAL

ANNUAL STATEMENT OF DEPOSITS & FILINGS
** TAX YEAR 2001 **

(Quarter)

<span style="float:right">TAX FILING SERVICE</span>

TELIA SWEDTEL INC

10520 NW 20 ST STE C-101
MIAMI            FL 33172-2181

| | |
|---|---|
| STATEMENT DATE | 03/02/02 |
| BR/COMPANY | E8/KZQ |
| AGENT | 005 |
| COMBO | NO |
| SHORT NAME | PN |
| FEDERAL ID: | 65-0555580 |

## ANNUAL FUTA INFORMATION

| | | | FUTA TAX<br>LIABILITY | FUTA TAX<br>DEPOSITED |
|---|---|---|---|---|
| TOTAL PAYMENTS PLUS EXEMPT | 330,043.69 | | | |
| EXEMPT PAYMENTS: | | | | |
| EXEMPT WAGES .......... | .00 | QTR 1 | 280.00 | 280.00 |
| *SEE DETAIL RIGHT SIDE | | QTR 2 | .00 | .00 |
| EXCESS WAGES .......... | 295,043.69 | QTR 3 | .00 | .00 |
| TOTAL EXEMPT PAYMENTS .. | 295,043.69 | QTR 4 | .00 | .00 |
| FUTA TAXABLE WAGES ....... | 35,000.00 | | | |
| GROSS FUTA TAX (AT .800) | 280.00 | TOTAL | 280.00 | 280.00 |
| CREDIT REDUCTION ......... | .00 | | | |
| TOTAL FUTA TAX | 280.00 | EXEMPT WAGES DETAIL: | | |
| | | QUALIFIED MOVING EE/ER | | .00 |
| | | DEPENDENT CARE | | .00 |
| | | MEALS | | .00 |
| | | QUALIFIED TRANSPORTION | | .00 |
| ANNUAL FILING RESPONSIBILITY: ADP | | CAF 125 MSA/GROUP T/L | | .00 |

## STATE WAGE RECAP

<span style="float:right">QRU BATCH NBR   01/A/008</span>

| STATE | SUI WAGES<br>SUI ID | EXPERIENCE<br>RATE/QTR | | CONTRIBUTIONS<br>ACTUALLY PAID |
|---|---|---|---|---|
| FL | 35,000.00 | .1000% 1-4 | | 35.00 |
| | 1542796    5 | | | |
| | | | TOTAL | 35.00 |

We have filed the Annual 940 information.

STATEMENT OF DEPOSITS    FILINGS                                    ADP TAX FILING SERVICE

•• FOURTH QUARTER  2001 ••

TELIA SWEDTEL INC                                    STATEMENT DATE  01/19/02
                                                     BR/COMPANY      EB/KZQ
                                                     AGENT           005
10520 NW 26 ST STE C-101                             COMBO           NO
MIAMI            FL 33172-2161
                                          SUI-ID:    1542798  5

## · STATE OF FLORIDA

| QUARTER WAGE RECAP: | | EMPLOYEES: TOTAL | MALE | FEM | NEW |
|---|---|---|---|---|---|
| SUI SUBJECT WAGES | 28,903.37 | MONTH 1 | 2 | 2 | O | HIRE |
| EXCESS SUI WAGES | 28,903.37 | MONTH 2 | 2 | 2 | O | |
| SUI TAXABLE WAGES | .00 | MONTH 3 | 2 | 2 | O | O |
| | | WAGE DTL | 2 | | | |
| | | SUI ER RATE | 0.1000% | | | |
| | | SUI LIMIT | 7,000 | | | |

ADP FILING RESPONSIBILITY:   SUI QUARTERLY
CLIENT FILING RESPONSIBILITY: NONE

| DEPOSIT DETAIL | | QBU BATCH NBR  01/4/009 |
|---|---|---|
| DEPOSIT DATE | EMPLOYER SUI | TOTAL |
| TOTAL DEPOSITS | .00 | .00 |
| TOTAL LIABILITY | .00 | .00 |
| •ADJUSTMENT | .00 | .00 |
| DIFFERENCE | .00 | .00 |

**We have filed this information with the appropriate agency.**

STATEMENT OF DEPOSITS & FILINGS       TAX FILING SERVICE

•• FOURTH QUARTER  2001 ••

TELIA SWEDTEL INC

10520 NW 26 ST STE C-101
MIAMI                    FL 33172-2181

```
STATEMENT DATE   01/19/02
BR/COMPANY       EB/KZQ
AGENT            005
COMBO            NO
DEP FREQ         SEMI-WEEKLY

FEDERAL ID:  65-0555590
```

## FEDERAL INFORMATION

| QUARTER WAGE RECAP: | | | | |
|---|---|---|---|---|
| 2) TOTAL WAGES, TIPS, OTHER COMP | 28,675.37 | 1) NO. OF EMPLOYEES | | |
| 4) ADJUSTMENT OF W/H INCOME TAX | .00 | 3) TOTAL INCOME TAX W/H | 5,432.37 | |
| 6A) TAXABLE SOC SEC WAGES | 8,250.59 | 5) ADJ TOT INCOME TAX W/H | 5,432.37 | |
| 6C) TAXABLE SOC SEC TIPS | .00 | 6B) TOTAL SOC SEC TAX W/H | 1,023.08 | |
| 7A) TAXABLE MEDICARE WAGES AND TIPS | 28,903.37 | 6D) TOTAL SOC SEC TIPS W/H | .00 | |
| 9) ADJ OF SOC SEC AND MEDICARE | .00 | 7B) TOTAL MEDICARE TAX W/H | 838.20 | |
| MEDICARE 3PSP TAXES | .00 | 8) TOTAL SS/MEDI TAX W/H | 1,861.28 | |
| SOC SEC EE 3PSP | .00 | 11) TOTAL TAX W/H | 7,293.65 | |
| UNCOL SOC SEC/MED | .00 | 12) ADVANCED EIC | .00 | |
| 10) ADJ TOT OF SOC SEC/MEDI TAX W/H | 1,861.28 | 13) NET TAXES | 7,293.65 | |
| FUTA TAXABLE WAGES | .00 | 14) TOTAL DEP FOR QTR | 7,293.63 | |
| | | FUTA TAX W/H | .00 | |

ADP FILING RESPONSIBILITY:  941 QUARTERLY,ANNUAL W-3/W-2,ANNUAL 940
CLIENT FILING RESPONSIBILITY: NONE

### 17) LIABILITY DETAIL        RECORD OF FEDERAL TAX LIABILITY

| LIABILITY DATE | FEDERAL INCOME TAX | EARNED INC CR | EMPLOYEE FICA | EMPLOYER FICA | TOTAL (MINUS FUTA) | |
|---|---|---|---|---|---|---|
| 10-25-01 | 2,303.09 | | 305.54 | 305.54 | 2,914.17 | |
| A)MONTH1 | 2,303.09 | | 305.54 | 305.54 | TOTAL ==> | 2,914.17 |
| 11-21-01 | 1,507.26 | | 267.08 | 267.08 | 2,041.42 | |
| B)MONTH2 | 1,507.26 | | 267.08 | 267.08 | TOTAL ==> | 2,041.42 |
| 12-21-01 | 1,622.02 | | 358.01 | 358.01 | 2,338.04 | |
| 12-31-01 | | | .01 | .01 | .02 | |
| C)MONTH3 | 1,622.02 | | 358.02 | 358.02 | TOTAL ==> | 2,338.06 |
| D) TOTAL LIAB. | 5,432.37 | .00 | 930.64 | 930.64 | 7,293.65 | |

STATEMENT OF DEPOSITS & FILINGS      TAX FILING SERVICE

•• FOURTH QUARTER 2001 ••

TELIA SWEDTEL INC

10520 NW 26 ST STE C-101
MIAMI        FL 33172-2161

| | |
|---|---|
| STATEMENT DATE | 01/19/02 |
| BR/COMPANY | EB/KZQ |
| AGENT | 005 |
| COMBO | NO |
| DEP FREQ | SEMI-WEEKLY |

FEDERAL ID: 85-0555580

## FEDERAL INFORMATION

| DEPOSIT DETAIL | | | | | QBU BATCH NBR | 01/4/008 |

| DEPOSIT DATE | FEDERAL INCOME TAX | EARNED INC CR | EMPLOYEE FICA | EMPLOYER FICA | TOTAL (MINUS FUTA) | FUTA |
|---|---|---|---|---|---|---|
| 10-31-01 | 2,303.09 | | 305.54 | 305.54 | 2,914.17 | |
| 11-28-01 | 1,507.26 | | 267.08 | 267.08 | 2,041.42 | |
| 12-27-01 | 1,622.02 | | 358.01 | 358.01 | 2,338.04 | |
| TOTAL DEP. | 5,432.37 | .00 | 930.63 | 930.63 | 7,293.63 | .00 |
| TOTAL LIAB. | 5,432.37 | .00 | 930.64 | 930.64 | 7,293.66 | .00 |
| ADJ. | .00 | .00 | .00 | .00 | .00 | .00 |
| BAL. (15) | .00 | .00 | .01 | .01 | .02 | .00 |
| OVER (16) | .00 | .00 | .00 | .00 | .00 | .00 |

The difference amount represents normal rounding errors which occur
when Tax Liabilities are recalculated several times during a reporting
period. Rounding differences are generally not collected or refunded.

We have filed the Quarterly 941 Return and have submitted your W-2s
on magnetic tape to the Social Security Administration.
We have also filed the Annual 940 Return.

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 02-20108-CIV-UNGARO-BENAGES

MAGISTRATE JUDGE BROWN

VAN ECK EMERGING MARKETS OPPORTUNITY
FUND, L.P., a Delaware limited partnership,

        Plaintiff,

v.

REPUBLIC OF NICARAGUA,

        Defendant.

_____/

**AFFIDAVIT OF DAG NORRBY
ON BEHALF OF SWEDTEL AB**

        The undersigned authority, Dag Norrby, being duly sworn, deposes and states:

1.     This affidavit is made in support of the Motion to Dismiss the Writ of Garnishment filed by Garnishee Swedtel AB in the above-styled action.

2.     I am the Corporate Secretary of Swedtel AB. Unless stated otherwise, I attest to the information contained in this affidavit based upon my personal knowledge.

3.     Swedtel AB is a Swedish corporation, with its principal place of business located at S-121 27 Johanneshov, Stockholm, Sweden.

4.    Swedtel AB is the parent corporation of Swedtel Inc., a wholly owned subsidiary. However, Swedtel AB and Swedtel, Inc. are separate legal entities. Swedtel AB does not control or direct the activities of Swedtel, Inc. Both corporations maintain their separate and distinct business records.

5.    Swedtel AB is not authorized by the Florida Secretary of State to transact business in the state of Florida. Moreover, Swedtel AB does not now nor has it ever conducted, engaged in, or carried on any business or business venture in the state of Florida. Nor has Swedtel AB ever solicited any business in the state of Florida.

6.    Swedtel AB has not entered into nor breached any contracts or agreements, written or oral, in the State of Florida.

7.    Swedtel AB does not now have nor has it ever designated a registered agent in Florida to accept service of process on its behalf.

8.    Swedtel AB does not maintain any business offices, agencies, or agents in the State of Florida, nor does it maintain any business records or records of accounts in the State of Florida.

9.    Swedtel AB does not maintain any bank accounts in the State of Florida and it has no telephone listings in Florida.

10.   Swedtel AB does not own or lease any real property in the State of Florida, nor does it operate, administer or control any real or personal property in the State of Florida.

2

11.     Swedtel AB has not committed any tortious acts in the State of Florida.

12.     Swedtel AB has not caused any injury to persons or property within the State of Florida.

FURTHER AFFIANT SAYETH NAUGHT.


By: _____

        Dag Norrby
        Corporate Secretary,
        Swedtel AB

FTL1 #579832 v1


I, the undersigned, Anne-Marie Bonde, Notary Public
c... of Stockholm, Sweden, certify that
DAG  N O R R B Y, Corporate Secr. of SWEDTE.
A
has issued and signed the foregoing document,
Fee 160:-    Stockholm, 2002-03-07
Crowns        Ex offico:

3